## ALLEN v. LOUISIANA.

1. If the provisions of a statute which are unconstitutional be so connected with its general scope that, should they be stricken out, effect cannot be given to the legislative intent, the other provisions must fall with them.
2. Neither the charter of the city of Louisiana, Missouri, approved March 12, 1870, construed with art. 10, sect. 14, of the State Constitution adopted in 1865, nor sect. 17, chap. 63, of the General Statutes of 1865, taken in connection with an amendment to that chapter adopted as sect. 52, March 24, 1870, authorized the city to subscribe to the capital stock of a railroad company organized under the laws of Illinois.
3. A popular vote in favor of a municipal subscription for stock of a railroad company cast at an election held without authority of law does not bind the municipality nor confer the power to make the subscription.

ERROR to the Circuit Court of the United States for the Eastern District of Missouri.

The facts are stated in the opinion of the court.

*Mr. S. T. Glover* and *Mr. John R. Shepley* for the plaintiff in error.

*Mr. James O. Broadhead, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

Art. 10, sect. 14, of the Constitution of Missouri, adopted in 1865, is as follows: —

"The General Assembly shall not authorize any county, city, or town to become a stockholder in, or to loan its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto."

The charter of the city of Louisiana, approved March 12, 1870, contained the following sections as sects. 8 and 9 of art. 3, and sect. 14 of art. 7: —

"SECT. 8. The bonded or funded debt of the city for all purposes, including one hundred thousand dollars subscribed (or to be lawfully subscribed) to railroads terminating at or passing through the city of Louisiana, shall not exceed the sum of two hundred thousand dollars: *Provided, however*, that said debt may be increased to a sum not exceeding two hundred and fifty thousand dollars in all, by ordinance or ordinances properly passed and sub-

mitted to an election under the authority of the city council of all resident taxpayers of the city, that is to say, of all adult persons who shall have been assessed and actually paid a tax on real or personal property for the year or the year previous to the year in which such election shall be held, and at such election the judges holding the same shall require proof of the payment of such tax before recording the vote of any person offering to vote at such election, and a majority of all the legal votes cast at said election shall determine the question for or against such ordinance.

" SECT. 9. The city shall have power to subscribe for stock in any incorporated railroad company connecting with the city of Louisiana, or give a bonus to any institution of learning by submitting an ordinance making the appropriation or authorizing the issue of bonds for any such purpose to a vote of the qualified voters (as provided by section 8) of the city, at any general election held in the city, or any special election expressly ordered, at which election a majority of the votes cast shall be for such ordinance."

" SECT. 14. The city shall not at any time become a subscriber for any stock in any corporation, except as authorized by this or some other act of the General Assembly, but said city may by ordinance appropriate money to aid in opening any road leading to the city, or in other improvements within the city, or in building any bridge within two miles of the city, and which may be deemed of general public benefit to the inhabitants of the city : *Provided, however,* that no appropriation shall be made for any improvement beyond the limits of the city, unless a vote be taken on such appropriation at some general election or special election ordered for that purpose, and a majority of all votes polled be cast in favor of that appropriation."

Under the authority of these provisions of the charter the city council, on the 10th of August, 1871, passed an ordinance, sect. 1 of which is as follows : —

" There shall be an election held at the several places in each ward for the holding general election in the city of Louisiana on the fifth day of September, 1871, on the proposition to take stock in the Clarksville and Western Railroad Company, or in the Quincy, Alton, and St. Louis Railroad Company : *Provided,* the said Quincy, Alton, and St. Louis Railroad Company shall cross the Mississippi River and make its southern terminus within the corporate limits of the said city of Louisiana, at such place as may

be agreed upon by the officers of said Quincy, Alton, and St. Louis company and the city council of Louisiana, to an amount not to exceed fifty thousand dollars ($50,000); said election to be conducted by the same judges and at the same places as the general election held on the Tuesday after the first Monday in March, 1871, and the returns to be made and certified to the city council in the same manner as that of any general election."

Other sections provided for the payment of the subscription in bonds, and for the form of the ballots. Sect. 4 provided that if on counting the votes it appeared that two-thirds of the legal votes cast at the election were in favor of the proposition a subscription might be made, and sect. 5 made provision for a registration of the voters prior to the day of the election.

The Quincy, Alton, and St. Louis Railroad Company was an Illinois corporation, one terminus of whose road was on the bank of the Mississippi River, in the State of Illinois, opposite the city of Louisiana. Before the day of election a full registration of the voters of the city was made, from which it appeared that there were three hundred and fifty-six qualified voters then in the city. On the day appointed an election was held, at which there were three hundred and thirty-six votes cast in favor of the subscription and ten against it. Afterwards the stock was subscribed to the Quincy, Alton, and St. Louis company, and the company having complied with the terms and conditions of the subscription, the bonds were delivered by the city, amounting in the aggregate to $50,000, in the following form : —

"Know all men by these presents, That the city of Louisiana, in the State of Missouri, is indebted to —— ——, or bearer, in the sum of one thousand dollars, lawful money of the United States of America, which the said city of Louisiana promises to pay on the second day of October, 1891, at the treasurer's office in the city of Louisiana, Mo., with interest thereon at the rate of eight per cent per annum, payable annually on the first day of January in each year, upon presentation and surrender of the annexed coupons, as they severally become due and payable. This bond is issued by the city of Louisiana, under authority of the General Assembly of the State of Missouri, entitled 'An Act to amend and reduce into one the several acts incorporating the city of Louisiana,' approved

March 25, 1870; also an ordinance of the city council of the city of Louisiana, No. 628, passed Sept. 26, 1870.

"In witness whereof, the city of Louisiana has caused its seal to be hereto affixed, and the same to be signed by the mayor, and countersigned by the clerk of the city council, at the city of Louisiana, Mo., the fourth day of November, in the year of our Lord eighteen hundred and seventy-one.

[SEAL.]                              " WM. PARKER,
                                        *" Mayor of City of Louisiana.*
Countersigned,                       " N. H. GRIFFITH,
                                        *" Clerk City Council."*

The city paid without objection the first instalment of interest as it fell due, but since that time has been in default. This suit was brought on seventy-nine coupons, past due, of which the plaintiff's intestate was a purchaser for value before maturity without notice.

Upon this state of facts the Circuit Court gave judgment for the defendant, and to reverse that judgment this writ of error has been brought.

The question which lies at the foundation of this case is whether the legislature of Missouri has, by a valid law, authorized the city of Louisiana to subscribe to the capital stock of the Quincy, Alton, and St. Louis Railroad Company, an Illinois corporation. It is conceded that if there was no such law the judgment below was right. It is also conceded that such a subscription could not be made on the vote of a majority of the taxpayers of the city, because the General Assembly is prohibited by the Constitution from granting authority for that purpose except upon the assent of two-thirds of the qualified voters. Neither is it contended that the qualified voters, whose vote is to be taken under sect. 9 of the charter, are not the resident taxpayers specified in sect. 8; but the claim is that, if this unconstitutional provision is disregarded, enough can be found in the other parts of the sections to authorize the subscription.

It is an elementary principle that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional

will be rejected. "But," as was said by Chief Justice Shaw, in *Warren* v. *Mayor and Aldermen of Charlestown* (2 Gray (Mass.), 84), "if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them." The point to be determined in all such cases is whether the unconstitutional provisions are so connected with the general scope of the law as to make it impossible, if they are stricken out, to give effect to what appears to have been the intent of the legislature.

It is contended that, with a proper application of these principles, sufficient authority for this subscription can be found either in sects. 8 or 9, art. 3, or sect. 14, art. 7.

As to sect. 8. This section provides, in substance, that the bonded or funded debt of the city, including $100,000 subscribed or lawfully to be subscribed to railroads terminating at or passing through the city, shall not exceed $200,000 without the assent of a majority of the resident taxpayers, but that with the assent of the taxpayers, given in the way pointed out, the debt may be increased to $250,000. It authorizes no subscription to railroad corporations, but recognizes the fact that under certain circumstances such a subscription may be lawfully made, and limits the permanent debt to be incurred for that and other purposes to $200,000, without the consent of the taxpayers, and to $250,000, with their consent. In other words, it is a charter provision against incurring a bonded debt beyond the prescribed amounts. That is the whole scope and effect of this section.

As to sect. 9. This, when taken in connection with the requirements of the Constitution, cannot be construed as being of itself a grant of authority to subscribe, because it makes a subscription dependent on a majority vote of the resident taxpayers, while the Constitution requires the assent of two-thirds of the qualified voters. In the construction of a statute, every word is, if possible, to be given some effect. Nothing is to be

stricken out if it can be avoided. It is not to be presumed that the legislature intended any part to be without meaning. In the light of these maxims of interpretation, the substantial object of this section evidently was to limit to a greater extent than had been done by the Constitution the power to subscribe to the stock of railroad companies connecting with the city. Under the Constitution, a two-thirds vote of the qualified voters, taken under the authority of law, would be enough; but under the charter, the two-thirds vote of the qualified voters required by the Constitution, and a majority vote of the taxpayers, were both necessary. The charter limitation could be repealed. It was in the nature of a legislative regulation which could be dispensed with whenever, in authorizing a particular subscription or otherwise, the legislature should so declare. As it stands, it operates as a charter protection to the taxpayers against the imposition of burdens of this kind by the qualified voters alone, but of itself it authorizes no subscription.

Had there been no constitutional restriction put on the legislature in matters of this kind, the language employed might have been susceptible of a different meaning; but with the Constitution as it is, the entire provision as to the majority vote of the taxpayers, to which the legislature evidently attached special importance, must be stricken out, and that of the Constitution as to the two-thirds vote of the qualified voters inserted by implication, before it can be said that what now appears to be a limitation was, in fact, a positive grant of power. We are clearly of the opinion that this cannot be done consistently with the evident purpose of the law, and, as a consequence, that no authority for the subscription can be found in this section of the charter.

As to sect. 14, art. 7. This clearly gives no affirmative power to subscribe. It is, in effect, nothing more than a provision that no subscription shall be made unless expressly authorized by law, which is but an enactment of what had before become a well-established rule of decision. It authorized appropriations of money for the purposes specified, on a majority vote of the qualified voters at a general or special election, and it recognized the fact, which is no longer disputed, that the legislature might authorize the city, in a proper way, to become

a subscriber to stock in some corporations. This is the full extent of the operation of that section.

These, so far as we can discover from the record, were the only provisions of law relied on in the court below to sustain the subscription for the payment of which the bonds now in question were issued. In this court, however, it is contended that power to make the subscription may be found in sect. 17, chap. 63, of the General Statutes of Missouri, of 1865, taken in connection with an amendment to that chapter, adopted as additional sect. 52, March 24, 1870. Session Acts, pp. 89, 90. Upon this point it is sufficient to say that the Quincy, Alton, and St. Louis company was an Illinois corporation, and under sect. 17 authority was only given to subscribe to the stock of companies organized under the laws of Missouri. By the amendment of 1870 (sect. 52), under certain circumstances, railroad companies of other States might extend their roads into Missouri, "and for that purpose . . . possess and exercise all the rights, powers, and privileges conferred by the general laws of this State [Missouri] upon railroad corporations organized thereunder;" but this did not make them corporations "organized under the laws of Missouri." If, as is argued, the foreign corporation got, as one of the privileges conferred on it by this law, the right to receive municipal subscriptions, it was of no practical value as a privilege until the power to subscribe was in some form given to the municipalities.

It is of no importance that two-thirds of the qualified voters of the city gave their assent to the subscription at the election which was called. It has been uniformly held that until the legislature authorizes an election, a vote of the people cannot be taken which will bind the municipality or confer upon the municipal authorities the power to make such a subscription. The legislative authority to obtain the popular assent is as essential to the validity of the election as it is to the subscription.

*Judgment affirmed.*