Finis RECTOR, James Rector, Gladys Rector, Billy Newlin, Jim T. Newlin, Letha M. Newlin, LaVerne Hyde and Mildred Hyde, Appellants,

v.

The TOBIN CONSTRUCTION COMPANY, Inc., a Corporation, Respondent.

No. 49318.

Supreme Court of Missouri,

En Banc.

March 9, 1964.

Rehearing Denied April 13, 1964.

Charles A. Powell, Jr., Macon, for appellants.

William H. Becker, Terence C. Porter, Columbia, Bollow, Crist & Oswald, Shelbina, for respondent.

Ben Ely, Roger W. Hibbard, Hannibal, amici curiae.

LEEDY, Judge.

Action to recover double damages under § 236.270, RSMo 1959 and V.A.M.S., for the trespass of backing up water on and overflowing lands of the respective plaintiffs to the injury and damage of growing crops thereon, allegedly in consequence of

defendant having dammed and obstructed a watercourse in violation of said statute. Trial to the court without a jury; judgment for defendant; plaintiffs appealed, and the St. Louis Court of Appeals reversed and remanded for new trial. On defendant's application to this court, the case was ordered transferred here under Art. V, § 10, Mo.Const., V.A.M.S., and Rule 84.05, V.A.M.R.

The facts are stated in the opinion of the Court of Appeals (Rector v. Tobin Construction Co., 351 S.W.2d 816), to which reference is made for a more complete statement thereof than we find necessary to the disposition of what we deem to be the determinative question. That question occasioned transfer of the cause, and it is whether, under the facts in judgment, defendant is entitled to share the immunity from liability enjoyed by the authority with which it contracted for injuries growing out of work incidental to the performance of such contract, there being no charge or claim that the contractor was guilty of negligence.

Defendant, a corporate construction contractor, pursuant to a contract with the State Highway Commission, performed certain grading and other work as part of the relocation of U. S. Highway 36 in Macon County, including the construction of a bridge across Middle Fork of Chariton River, a nonnavigable, natural watercourse, referred to in the evidence as a creek. The stream at that point flows in a southerly direction, and it is approximately 35 or 40 feet in width from bank to bank. The highway runs east and west. The lands of plaintiffs lie upstream, to the north of the highway. Immediately north of the site of the bridge, but wholly within the right-of-way of the highway, defendant, while engaged in constructing the bridge, built a dirt fill or dam across the bed of the stream, the bottom of the bed being 8 to 10 feet below the top of the banks. Except in periods of little or no rainfall the flow of the stream is 6 to 12 inches in depth. The fill was about 14 feet in width (north and south) and extended east and west completely across the bed of the stream (35 or 40 feet). Its height was estimated by plaintiff's witnesses as being from 8 to 12 feet, and was fixed by defendant's witnesses at 6 or 7 feet. It sloped from each bank toward the center, where it was 2 feet lower than at the banks. A metal drain pipe 3 feet in diameter ran through the fill parallel with the stream, and this permitted the normal flow of the stream to pass through. Heavy rains occurred over a period of several days, notably from July 15 through July 29. July 21–22 nearly 4 inches fell, and July 27–29 more than 4 inches fell, with the result that the lands in question were overflowed to depths varying up to 3 feet. The lands were low-lying and subject to frequent flooding. Even so, and notwithstanding the fact that lands below the dam or fill were flooded and crops damaged, we shall assume for present purposes (as the trial court found) that the fill materially retarded the flow of water occasioned by the rainfalls above mentioned, and prevented the overflowed water from draining from the lands of plaintiffs for a period of time sufficient to kill and injure substantial portions of the crops, the extent of which, in money, the court found to be a total of $3,667.50.

The contract under which defendant built the bridge made no specific reference to a dam or fill across the creek, but did require "any incidental work necessary to complete" the project contracted. And it was stipulated "that defendant had to move dirt [and machinery] across the creek." Defendant's project superintendent, with 23 years' experience, testified it was reasonably necessary in the performance of the contract to have this crossing placed across the stream; that it was necessary for the movement of equipment, materials and dirt back and forth across the stream, and that he did not know of any practical means of getting equipment, materials and dirt across the stream other than by this crossing.

E. E. Baker, an engineer with the Missouri State Highway Department since

1926, whose duties included supervising, approval and disapproval of work done by contractors with the Highway Department, testified to this effect: That the project in question was assigned to him as Resident Engineer; that he was at the site about every day; that he saw and was familiar with the earthen crossing; that the erection of the crossing was a customary and normal procedure in that kind of work— "it was the general practice and I made no objection. I think I could have stopped him if that was unusual." He further testified that he did not know of any other way of getting the dirt, machinery and materials across "without going to elaborate bridging to cross on, which has never been practiced before;" and that it was "reasonably necessary and incidental to the performance by defendant of its contract with the state," and that he approved its use.

Another of defendant's witnesses was also an engineer for the Highway Department and an inspector, as well, working under the witness Baker. He testified that he had had 11 years' experience in the type of bridge construction here involved, and he was present at the site of construction daily; that he was familiar with the plans and construction requirements for the project, and also with the earthen crossing; that the latter was reasonably necessary and incidental to the performance of the contract; that the use and erection of such a crossing is a normal and customary procedure, and that in this case there was no other way to move the heavy equipment across the stream. In the latter connection he was corroborated by another witness with engineering experience.

■ No countervailing proof was offered by plaintiffs. And on the basis of the foregoing, the trial court made these specific findings, which we think the evidence abundantly warranted: "The earthen fill in evidence was not specifically directed by the plans and specifications in evidence; it was constructed by the defendant, was incidental to the performance by defendant

of its contract with the State Highway Commission; was reasonably necessary for the purpose for which it was intended and was used, and was a reasonable, customary and approved method of moving machinery and fill materials across a watercourse." And that "any method of conveying machinery and fill materials across the Middle Fork of the Chariton River (even by pontoon bridge) which the defendant could have employed would have resulted in some obstruction to the flow of water." Upon such hypotheses the court concluded (contrary to the theory advanced by plaintiffs), "Therefore liability of the defendant cannot be predicated upon the theory that the obstruction here was 'for the convenience' of the defendant [within the rule applied by the Supreme Court of Arkansas in Foohey Dredging Co. v. Mabin, 118 Ark. 1, 175 S.W. 400, and Kochtitzky v. Bond, 128 Ark. 255, 194 S.W. 8] * * *."

■ The Court of Appeals was "not impressed by the contention that the fill was essential to the work being done under the contract," and declined to give effect to the trial court's finding in that regard (which finding we regard as correct and unassailable). Then on the authority of the two Arkansas cases above referred to, and Asheville Const. Co. v. Southern Ry. Co., 4 Cir., 19 F.2d 32, rejected defendant's claim of shared immunity, and held it to be liable for such damages as the fill was instrumental in causing. We regard both aspects of such ruling to be erroneous, and this is our only point of difference with the opinion. The findings of the trial court hereinabove set out and characterized as "abundantly warranted" (by the evidence) should not have been rejected in the absence of a valid basis for so doing. Nor, in this view, did the facts call for or permit the application of the doctrine of the two Arkansas cases, supra, which limit or make inapplicable the rule of shared immunity where the offending instrumentality is for the convenience of the contractor, no element of the latter being in the case. Neither are we concerned with an in-

trusion resulting from extra-hazardous activities. For this reason, the case principally relied on by plaintiffs (Asheville Const. Co. v. Southern Ry. Co., 19 F.2d 32) is not in point. That case involved blasting operations by a road contractor whereby rocks and debris were thrown on to the plaintiff's railroad tracks. (An exhaustive opinion involving ultrahazardous activities, not here in point, will be found in the recent case of Berg v. Reaction Motors Division, 37 N.J. 396, 181 A.2d 487.)

While the extent of the right of a private contractor with a public body to share the latter's immunity from liability for damages is a subject upon which much has been written, the only cases of this court on the point to which we have been cited are Evans v. Massman Const. Co., 343 Mo. 632, 122 S.W.2d 924, and Kenton v. Massman Const. Co., (Mo.) 164 S.W.2d 349. 43 Am.Jur., Public Works and Contracts, § 83, states the rule thus: "The theory is that one who contracts with a public body for the performance of public work is entitled to share the immunity of the public body from liability for incidental injuries necessarily involved in the performance of the contract, where he is not guilty of negligence. In other words, when the act or failure to act which causes an injury is one which the contractor was employed to do and the injury results not from a negligent manner of doing the work, but from the performance thereof, the contractor is entitled to share the immunity from liability which the public enjoys, but he is not entitled to the immunity of the public from liability where the injury arises from the negligent manner of performing the work." See, also, Anno.: 69 A.L.R. 489; Anno.: 97 A.L.R. 205.

■ 81 C.J.S. States § 131, pp. 1144–1145, states that, as regards immunity from tort liability, an independent contractor doing work for the state "is responsible only when it is shown that his work was carried out in a negligent manner, and, where he performs his work in accordance with plans and specifications and is guilty of neither negligence nor willful tort, he is not liable for any damage that might result."

■ Negligence on the part of defendant in erecting the fill or dam has been completely disavowed by plaintiffs throughout the trial and here, and they insist they are proceeding exclusively on the theory of trespass (supposedly as constituting a wilful tort, within the foregoing rule, but without having expressly so denominated it). We are of the opinion that the undisputed evidence that there was no practical way of moving the fill material and heavy machinery (concededly necessary) across the watercourse except by means of the fill or dam justified the court in finding that the construction thereof was incidental to the performance of the contract, was reasonably necessary for that purpose, and was a reasonable, customary and approved method, and being so, this is sufficient to equate, in legal contemplation, the construction of the fill with doing the work in strict accordance with the contract and plans and specifications. In this view, we think the case should be governed by the principle applied in Valley Forge Gardens, Inc. v. James D. Morrissey, Inc., 385 Pa. 477, 123 A.2d 888, as regards the asserted liability of defendant for trespass. In that case the road contractor had constructed a fill 35 feet high and 1000 to 1500 feet in length. It crossed a small stream which fed plaintiff's ponds, and which stream was conducted through the made embankment by a steel pipe culvert. The plaintiff's ponds were some 1200 feet distant from the highway. Dirt and silt washed by the natural effects of erosion from the slope of the fill had been carried by the stream into plaintiff's ponds and eventually filled them. There was no proof that defendant contractor had performed its work negligently and that issue was withdrawn from the jury. Notwithstanding this, and the fact that defendant had affirmatively proved that all its work had been done in strict accordance with the contract and plans and specifica-

**414**

tions, it was sought to hold the contractor on the further theory that it had been guilty of a wilful tort because of its trespass *quare clausum fregit*. In denying this claim, too, the court said: "[T]here is an obvious and material difference between intending an act and intending the consequences of an act. As recognized in Bowman v. Pennsylvania R. R., 299 Pa. 558, 567, 149 A. 877, 880, certiorari denied 282 U.S. 849, 51 S.Ct. 27, 75 L.Ed. 752,—'To be willful the harm must have been intentionally inflicted'. It is inherent in the theory of trespass q. c. f. that ' "The intention which is required to make the actor liable * * * is an intention to enter upon the particular piece of land in question irrespective of whether the actor knows or should know that he is not entitled to enter thereon." ' Restatement, Torts, § 163, comment *b*, quoted with approval in Kopka v. Bell Telephone Company of Pennsylvania, 371 Pa. 444, 450, 91 A.2d 232, 235. A voluntary act may result in injury to another, but it is only when *the harm* is intentionally inflicted that there is a 'wilful' tort. The facts of the instant case well illustrate the distinction. While the non-negligent intentional construction by the defendant resulted in harm to the plaintiff in a way sufficient to support a charge of trespass q. c. f., it cannot be contended that the defendant intended to invade the interests of the plaintiff when it intentionally constructed the fill. Hence, there was no wilful tort." See, also, Meier v. Frank Mashuda Co., (Ohio App.) 168 N.E.2d 319; Wood v. Foster & Creighton Co., 191 Tenn. 478, 235 S.W.2d 1.

 As defendant has been guilty of neither negligence nor wilful tort, it is not liable to plaintiffs for the damages to their crops resulting from its performance of the state's contract. We quite agree with much of the argument in the able brief of amici curiae inveighing against the principle of sovereign immunity from tort liability as not embodying sound social policy in accordance with present-day polit-

ical ethics. We do not explore that field, inviting as the opportunity may seem to be. The amici brief concedes "the principle is so thoroughly established in our law that it cannot now be abrogated by judicial decision" (citing Hinds v. City of Hannibal, Mo., 212 S.W.2d 401), and, accordingly, directs its fire against extending the principle. But the holding just announced does not run counter to any of our cases, nor, in our opinion, does it extend the principle beyond pre-existing limits.

The judgment is affirmed.

All concur, except HOLMAN, J., not sitting.